# CHARLESTON.

## CARTER *v.* STOWERS *et als.*

Submitted May 27, 1913.   Decided June 24, 1913.

1.  MUNICIPAL CORPORATIONS—*Commission Form of Government—Effect as to Political Organizations.*

The charter of the City of Bluefield, providing for commission bi-partisan government, does not guarantee the existence of established political organizations nor preclude the formation of new ones.   (p. 664).

2.   ELECTIONS—*Party Organization—Affiliation of Voters.*

Voters may belong to one political organization for national and state purposes and another for municipal purposes.   (p. 664).

3.   SAME—*Voters—Party Affiliations.*

In an election under said charter, a voter may vote for the regular candidate of the Republican party, nominated by convention, and for the candidate of the Independent Republican party, nominated by petition, they being on separate tickets on the same ballot sheet, notwithstanding the latter filed an affidavit saying he was a member of the Republican party, claimed allegiance thereto and had been nominated by petition. (p. 665).

4.   SAME—*Ballots—Mode of Voting.*

Under said charter, authorizing any political party to nominate twice as many candidates for offices as can be elected to represent it in offices of the class for which they are nominated, a voter may validly vote for all the candidates on his ticket, and is not bound to vote for only part of the candidates on his ticket for a given office and the balance on some other ticket.   (p. 665).

(MILLER, JUDGE, absent.)

Petition by E. E. Carter against S. Frazier Stowers and others.

*Writ Awarded.*

*Sanders & Crockett* and *John R. Dillard,* for petitioner.

*Ross & Kahle, Vinson & Thompson,* and *D. M. Easeley,* for respondents.

POFFENBARGER, PRESIDENT:

At an election held in the city of Bluefield on the 6th day of May, 1913, for the election of city officers, under its charter providing for said city a commission form of government, Carter was the nominee of the Republican party for member of the Board of Affairs, J. B. Shumate of the Democratic party, J. R. Johnson of the Progressive party, Henry A. Lilly of the Independent Republican party and A. Lynch of the Independent Democratic party; the first three of whom were regularly nominated by conventions of their respective parties, and the last two by petitions filed in accordance with the statute.   As a result of the canvass of the votes, made on the 13th day of May, 1913, Carter had 927 votes, Shumate 925, Lynch 816, Lilly 762 and

Johnson 239. As Carter and Shumate were the two candidates having the highest number of votes, both were elected to membership in the Board of Affairs, but in order to determine which of them should be mayor, it became necessary to ascertain finally which of them had the highest number of votes. Accordingly, Shumate, believing himself to have received the greater number of valid votes, demanded a recount which resulted in a finding of 913 votes for him and 909 for Carter. This result was accomplished, in part, by rejecting 25 votes cast for Carter on ballots marked for Carter and Lilly, the regular Republican nominee and the nominee for the Independent Republican party, and by rejecting ten votes cast for Shumate on ballots marked for Shumate and Lynch, the regular Democratic nominee and the nominee of the Independent Democratic party. This action was based upon the view that Carter and Lilly were both republicans and·Shumate and Lynch both democrats, and, therefore, not entitled to the vote of any person on the same ballot. In other words, the canvassers were of the opinion that no voter could vote for both Carter and Lilly because they were republicans, nor for both Shumate and Lynch because they were democrats. The charter was construed as inhibiting the voter from voting for two candidates representing the same political party, and ballots prepared in violation of this supposed limitation were treated as void for all purposes.

We have just decided in the case of *Peyton* v. *Holley et als,* not yet reported, that a charter adopting a commission form of government for a city was not intended to secure the existence or continue the maintenance of the political parties in existence at the time of its adoption, nor to prevent the formation of new political parties by dissatisfied members of old ones. We have also decided that a new party may be organized under the name of an old one, qualified by some distinguishing word, such as "independent." The distinction between party affiliation for national and state political purposes and party affiliations for municipal purposes, has also been marked. A voter may belong to one party for national and state purposes and another for municipal purposes. All this, however, is subject to the limitation of honesty and sincerity of purpose in the organization of such new party. And our conclusions in that

case have not been changed in any manner by the argument submitted upon the hearing of this one.

. In the matter of party nominations and recognition of political parties, these charters adopt the general state law. The Bluefield charter provides in section 10 thereof as follows: "Candidates to be voted for at any municipal election for members of the board of affairs and members of the council, may be nominated by convention, primary or petition, in the manner and under the provisions now or hereafter prescribed by state laws relating thereto." These laws prescribe the mode and manner of obtaining and holding a status as a political party and securing representation upon ballots as such to be used in elections. Since they are adopted for the purposes of commission government and elections under charters providing for such government, the ascertainment of the existence of a political party or organization and its character is governed by the same rules as are applied in ascertaining the existence and character of political parties for all other purposes, and when it has been ascertained and the existence of the party established, its rights in respect to representation in municipal offices are governed by the provisions of the charter.

The petition by the filing of which Lilly was nominated, signed by numerous voters, declared him to be the representative of the Independent Republican party. By virtue of this petition, he obtained a place on the official ballot as a candidate under the party name adopted in the petition. Complying with a requirement of the charter, he filed with the city auditor an affidavit, dated April 18, 1913, saying he was a member of the republican party and claimed allegiance thereto and had been nominated for member of the board of affairs by petition duly filed. No petition nominating him other than the one mentioned was filed. None nominating him as a candidate of the republican party could have been filed, for that party nominated by conventions of their respective parties, and the last affidavit filed at the hearing of this case, he says he has always affiliated with the republican party, did not participate in the republican convention, was afterward induced to run independent and as a republican, was nominated as such by petition, filed an affidavit declaring himself a republican, and would have represented the republican party, if he had been elected. He

assigns as his reason for non-participation in the convention his inability conscientiously to support the man he knew would be nominated. This state of facts is relied upon as proving he was a candidate of the regular republican party, notwithstanding his candidacy as the representative of a rival organization having a different candidate. He was unquestionably the nominee of persons opposed to the election of the regular republican nominee. These two organizations must have represented different measures or policies of city government. They organized under a separate and distinct party name and nominated a candidate. Obviously there was no collusion between them, for they were vigorous antagonists. Lilly's affidavits manifestly mean no more than that he affiliates with the republican party in national and state politics. The petition by which he was nominated fixed his status as a candidate for the purposes of the election in question, no collusion or fraud having been shown, and voters could legally vote for both him and Carter, under the interpretation of the charter as to a limitation upon the right of voters assumed by the board of affairs to exist.

And there is another avenue by which the same conclusion can be reached. The question presented differs from the one involved in *Peyton* v. *Holley et als.* Here both candidates are elected and the votes in question are considered only upon an inquiry as to which of them shall be mayor by virtue of his recipiency of the larger number of votes. The board of affairs deducted from the total vote received by Carter 25 votes on the assumption that the voters in casting them had voted for two republicans for the office of member of board of affairs, instead of one republican and one democrat, or one republican and a candidate of some other party. These ballots were treated as void and not countable for any person, because the charter, it is argued, does not permit a person to vote for two candidates of the same political party. There is no such express inhibition in it. For all that appears in its terms, a voter may vote for two candidates of the same political party, and it permits a political party to nominate two candidates for each office it is entitled to fill as a winning party in the election. The argument assumes obligation on the part of a voter to vote for a candidate for that particular office on each of two tickets be-

cause two offices and only two were to be filled by the election
of two men from different political parties. The statute con-
templates party representation and permits any political party
to nominate twice as many candidates as there are offices which
it can fill. This provision may be designed to set party against
party as well as candidate against candidate. If a republican
is permitted to vote for two republican candidates and his vote
can be counted, that gives his party an advantage over any
other rival party without deciding as between the two candidates
of his own party, and he may wish to vote for two candidates of
his own party in order to obtain that advantage, to the end
that his party may prevail over its rival in the election. In so
doing, he may leave the matter of choice between the candi-
dates of his party to be settled by other voters who have pref-
erences as between them. In other words, the legislature may
have intended to afford opportunity to the voter to vote for
only one candidate, and the voters of each political organiza-
tion to settle among themselves the election of an officer from
among their number, while the voters of other political organ-
izations express their preference as between men of their party.
At any rate, the legislature has not expressed any intention to re-
quire a voter to vote for only one candidate of his party. If
such intention is to be found in the statute, it is matter of im-
plication. There are two offices to be filled in this instance,
and though only one republican or one democrat, as the case
may be, can be elected to one of these offices, the contest goes
beyond the individuals who are candidates to rivalry between
the political organizations, and, if the voter sees fit to vote for
two men of his own party, his vote so cast sustains his party
against other political organizations, without expression of pref-
erence between candidates of the party, and is therefore not
wholly lost. It has an effect notwithstanding the inability of
his party to put two of its members into the office. If this be
the true construction of the statute, the 25 votes deducted from
Carter's total of ballots cast for him were valid and countable
for him, though it be conceded that Lilly was a republican.

Shall we insert this inhibition or limitation in the statute
as having been necessarily implied? It is not necessary to the
maintenance of bi-partisan administration. That is controlled
by the rule governing selection of the officers from the candi-

dates, after the election and others providing for division of patronage or appointive offices between the prevailing parties. The right of members of a party to vote for two of its candi-dates at the same time may be a valuable one and highly neces-sary to the maintenance of party representation in office as has been shown. The legislature omitted this inhibition. Why did it do so? Presumptively because that body deemed it un-necessary for the accomplishment of the purpose of the act. If we insert it as something implied, we must find it is essential to the achievement of the legislative purpose, for only neces-sary implications can be adopted. Is it necessary? Not at all, for the reason already indicated. Under certain conditions, its tendency would be to defeat the legislative purpose, rather than advance it.

*Writ Awarded.*